# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

---

N° 09-CV-3464 (JFB)

---

EDDIE RUSH,

Petitioner,

VERSUS

JOHN B. LEMPKE,

Respondent.

---

MEMORANDUM AND ORDER
February 2, 2011

---

JOSEPH F. BIANCO, District Judge:

Eddie Rush (hereinafter "Rush" or "petitioner") petitions this Court *pro se* for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his conviction in state court. Petitioner was convicted in a judgment rendered on May 20, 2003, following a jury trial, in the County Court, Nassau County, of one count of burglary in the first degree (N.Y. Penal Law § 140.30[4]), one count of grand larceny in the third degree (N.Y. Penal Law § 155.35), one count of grand larceny in the fourth degree (N.Y. Penal Law § 155.30[8]), two counts of robbery in the first degree (N.Y. Penal Law § 160.15), one count of robbery in the second degree (N.Y. Penal Law § 160.10[1]), one count of criminal use of a

firearm in the first degree (N.Y. Penal Law § 265.09[1]), one count of criminal use of a firearm in the second degree (N.Y. Penal Law § 265.08[2]), and one count of criminal possession of a weapon in the second degree (N.Y. Penal Law § 265.03). Petitioner was sentenced to concurrent, determinate terms of imprisonment, the longest of which was twenty-five years.

Petitioner challenges his conviction on the following grounds: (1) the trial court denied his due process rights by shackling him during trial; (2) the trial court erroneously admitted an out-of-court statement made by a non-testifying co-defendant; (3) the trial court erroneously denied petitioner's request to proceed *pro se*; and (4) the sentence imposed upon him

by the court was excessive.[1] Respondent seeks to dismiss the instant habeas corpus petition because petitioner failed to file it within the applicable statute of limitations period provided by 28 U.S.C. § 2244(d)(1). The Court concludes that Rush's petition is untimely under Section 2244(d)(1) and finds that there is no basis for equitable tolling or statutory tolling of the statute of limitations. In the alternative, the petition is denied in its entirety on the merits.

## I. FACTUAL BACKGROUND

The Court has adduced the facts below from the instant petition and underlying record.

On November 24, 2000, at about 1:45 p.m., petitioner and an accomplice ("Eason" or "accomplice"), masked and armed with handguns, invaded the Malverne, New York, home of John and Nonthawan Vallely and their five-month old son. (Tr. 552-53, 556, 599-602.)[2] Petitioner and Eason ordered the Vallelys to remove their clothing, forced them into the bathroom, and directed them to lie down on the floor on top of one another. (Tr. 555-57, 602.) Petitioner and his accomplice left with the Vallelys' automobile, cash, and a cell phone. (Tr. 554-55, 603.)

Shortly after leaving the Vallely home, petitioner and Eason were spotted by the police in the stolen vehicle nearby. (Tr. 618-20.) Rush led pursuing police officers on an erratic, high-speed chase, colliding with and sideswiping numerous vehicles, which ended when he rear-ended a car occupied by New York City detectives. (Tr. 622, 626-27, 649-51.) During the chase, the passenger door of the car opened a few inches and closed again. (Tr. 623, 650-52.) A loaded handgun was recovered near the site where petitioner collided with another vehicle, and was identified by the Vallelys as the one displayed by one of the burglars. (Tr. 603-04, 671-73, 675.)

Petitioner and Eason were taken into custody and transported to the Fifth Precinct in Nassau County. At the stationhouse, Eason was searched and found in possession of house keys, car keys, and a mitten with the word "Echo" written on white, reflective material on the back. (Tr. 681-82, 808-09, 827-29.) Detectives then returned to the area around the Vallely home and discovered that the car keys recovered from Eason opened a blue-green Nissan Quest parked only 100 feet from the Vallelys' home. (Tr. 809-10.)

The following day, on November 25, 2000, Rush and Eason were transported to detention from the 85th Precinct station house. (Tr. 796-98.) During the trip, Eason is reported to have said that he "shouldn't have thrown the gun out the window." (Tr. 797.)

When detectives examined the stolen vehicle that Rush and Eason were driving during the police chase, they found a black wool ski mask, a black knit glove, and some cash on the floor of the front driver's side. (Tr. 725-32, 778-82.) On the floor of the right rear passenger's side was another black

---

[1] Petitioner withdrew his argument that his sentence was excessive, conceding that he has no viable claim on this basis. (Pet'r's Pro Se Reply dated Aug. 10, 2010 ("Pet'r's Merits Resp.") at 8, n.3.) (petitioner "withdraw[s] this claim recognizing no Federal claim upon habeas review . . . ."). In any event, even if it were not withdrawn, the Court would similarly conclude that there is no viable habeas claim on this ground for the reasons set forth in respondent's opposition to the petition. As a result, the Court does not address this argument further.

[2] "Tr." refers to the trial transcript.

mask, and on the front passenger's seat were a pair of sunglasses and another black knit glove. (Tr. 725-32, 778-82.) Another glove was protruding from the compartment of the center armrest, and, near the gear shift detectives found an Ericson cell phone. (Tr. 725-32, 778-82.) Detectives also found a mitten with the word "Echo" written on white, reflective material, on the right, rear passenger seat of the car. (Tr. 725-34.)

At trial, the Vallelys identified the two ski masks found in the stolen vehicle as the ones worn by the robbers. (Tr. 561-62, 604.) Mr. Vallely identified the Ericson cell phone as the one stolen from him, (Tr. 558-59), and Mrs. Vallely identified the gun that was recovered near the area where the high-speed chase ended as the silver handgun brandished by the burglars. (Tr. 603-04.) The trial also included testimony from the officers and detectives involved in the high-speed chase, as well as testimony by the police officers who observed petitioner and Eason in the stolen car. (Tr. 618-21, 648-51, 672-73, 707-10.)

As his only witness, petitioner called Detective Vito Schiraldi ("Detective Schiraldi") of the Forensic Evidence Bureau of the Nassau County Police Department. Detective Schiraldi testified that he analyzed two hairs recovered from one of the ski masks found in the car. One of the hairs was approximately a centimeter long, the other about sixteen or seventeen centimeters long. (Tr. 864.) Detective Schiraldi testified that one of the hairs was of mixed racial origin. (Tr. 864.) Although a hair sample was taken from Rush for comparison, Detective Schiraldi said that Rush's hair sample was too short to produce any conclusive DNA information, and was therefore unsuitable for comparison. (Tr. 864-65.)

## II. PROCEDURAL HISTORY

### A. State Court Proceedings

On September 30, 2002, Rush and his co-defendant Eason pled guilty before the Supreme Court, Bronx County, to the charge of reckless endangerment in the first degree. Petitioner admitted to stealing the car that both he and Eason were found in at approximately 2:30 p.m. on November 24, 2000, in the vicinity of the Bruckner Expressway. (Tr. 843-44; Resp't's Merits Opp. dated May 12, 2010 ("Resp't's Merits Opp.") at 7-8, 20.)

On January 24, 2003, a jury convicted petitioner on all counts of the indictment charging him with various acts of grand larceny, burglary, robbery, and weapons use and possession. (Tr. 1037-40.) Judgment was rendered on May 20, 2003. Petitioner was sentenced to concurrent, determinate terms of imprisonment, the greatest of which was twenty-five years, with five years of post-release supervision. Additionally, the court imposed restitution in the amount of $6,624.62. Petitioner appealed his conviction to the Appellate Division, Second Department ("Appellate Division") arguing that: (1) the trial court erroneously denied his request to proceed *pro se*; (2) the trial court violated his due process rights by shackling him during trial; (3) the trial court erroneously admitted a co-defendant's out-of-court statement at trial; (4) the trial court incorrectly permitted the use of plea admissions at trial before he could attempt to challenge the voluntariness of those admissions; and (5) the sentence imposed on Rush was unduly excessive and harsh. On October 9, 2007, the Appellate Division affirmed the judgment of conviction. *People v. Rush*, 843 N.Y.S.2d 392, 392-93 (App. Div. 2007). The New York State Court of Appeals denied petitioner's

application for leave to appeal on December 20, 2007. *People v. Rush*, 880 N.E.2d 883 (N.Y. 2007). Petitioner did not petition the United States Supreme Court for a writ of certiorari.

On July 28, 2008, petitioner was transferred to New Jersey, Hudson County, in anticipation of trial on an unrelated matter. Petitioner wrote a letter notarized on October 15, 2008, to the Clerk of Court of the Southern District of New York, requesting an extension of time to file his habeas petition "until I have been returned TO THE New York Prison system" so that he may have access to his "legal property" necessary for him to "process" his habeas petition. (Habeas Pet. at 8.) It is unclear if this letter was ever sent to or received by the Clerk's Office in the Southern District of New York. Petitioner subsequently filed a letter with the Southern District of New York on June 11, 2009, indicating that he was "returned back to the N.Y.S. Department of Correctional [sic]" on May 28, 2009, and once again requested an extension to file his habeas petition. (Habeas Pet. at 9.)

On July 14, 2009, petitioner filed a motion to vacate his conviction pursuant to New York Criminal Procedure Law § 440.10. This motion was denied by the County Court as procedurally barred and meritless on October 13, 2009. *People v. Rush*, No. 404N-01 (County Court, Nassau County Oct. 13, 2009).

## B. The Instant Petition

On July 23, 2009,[3] *pro se* petitioner filed the instant application before this Court for a writ of habeas corpus. On September 29, 2009, respondent filed a motion to dismiss the petition as untimely. On February 23, 2010, petitioner filed his opposition to the motion to dismiss. On April 12, 2010, this Court ordered the parties to brief the merits of petitioner's application for habeas corpus. On May 12, 2010, respondent filed a declaration and memorandum of law in opposition to the petition. On May 19, 2010, the petitioner requested an additional thirty days to file his reply to respondent's opposition. By letter dated July 9, 2010, the petitioner requested another extension, which was granted. Petitioner filed his reply on August 24, 2010. The Court has fully considered the submissions and arguments of the parties.

## III. DISCUSSION

### A. Standard of Review

To determine whether petitioner is entitled to a writ of habeas corpus, a federal court must apply the standard of review set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Section 2254 requires that federal courts apply a

---

[3] Although the docket indicates that the instant petition was filed on July 29, 2009, petitioner claims that he mailed the petition on July 23, 2009. (Pet'r's Resp. to Resp't's Mot. to Dismiss dated Feb. 23, 2010 ("Pet'r's Resp.") at 5.) In accordance with the prison mailbox rule, *see Houston v. Lack*, 487 U.S. 266, 270-71, 273-74, 276 (1988); *Hill v. Senkowski*, 409 F. Supp. 2d 222, 229 (W.D.N.Y. 2006), and construing all facts in favor of petitioner, the non-moving party, the Court assumes for purposes of this decision that the petition was filed on July 23, 2009.

deferential standard of review to claims that were adjudicated "on the merits" in state court. Specifically, under § 2254(d):

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"Clearly established Federal law" is comprised of "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Green v. Travis*, 414 F.3d 288, 296 (2d Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

A decision is "contrary to" clearly established federal law, as determined by the Supreme Court, "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413. A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.*

AEDPA establishes a deferential standard of review—"a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001) (quoting *Williams*, 529 U.S. at 411). The Second Circuit has noted that although "[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Gilchrist*, 260 F.3d at 93 (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)).

B. Statute of Limitations

Respondent seeks to dismiss the instant habeas corpus petition because petitioner failed to file it within the applicable statute of limitations period provided by 28 U.S.C. § 2244(d)(1). For the reasons set forth below, this Court concludes that Rush's petition is untimely under Section 2244(d)(1) and finds that there is no basis for equitable tolling or statutory tolling of the statute of limitations.

The AEDPA imposes a one-year statute of limitations on state prisoners seeking habeas corpus review in federal court. 28 U.S.C. § 2244(d)(1). The statute begins to run from the latest of:

> (A) the date on which the [petitioner's] judgment [of conviction] became final by the

conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1)(A)-(D). Pursuant to AEDPA, "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation." 28 U.S.C. § 2244(d)(2). The Second Circuit has held that a state court application or motion for collateral relief is "'pending' from the time it is first filed until finally disposed of and further appellate review is unavailable under the particular state's procedures." *Bennett v. Artuz*, 199 F.3d 116, 120 (2d Cir. 1999); *see also Carey v. Saffold*, 536 U.S. 214, 217, 220-21 (2002); *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000); *Gant v. Goord*, 430 F. Supp. 2d 135, 138 (W.D.N.Y. 2006).

In the instant case, petitioner concedes that the statute of limitations began to run on the date petitioner's conviction became final, pursuant to Section 2244(d)(1)(A), because the other sections of AEDPA are inapplicable to his case. (Pet'r's Resp. to Resp't's Mot. to Dismiss dated Feb. 23, 2010 ("Pet'r's Resp.") at 8.) On December 20, 2007, the New York Court of Appeals denied petitioner's application for leave to appeal. Pursuant to Supreme Court Rule 13(1), the time for petitioner to seek review in the United States Supreme Court expired ninety days later. *See Williams v. Artuz*, 237 F.3d 147, 150 (2d Cir. 2001) ("[A] petitioner's 'conviction bec[omes] final for [AEDPA] purposes when his time to seek direct review in the United States Supreme Court by writ of certiorari expire[s].'" (quoting *Ross v. Artuz*, 150 F.3d 97, 98 (2d Cir. 1998)) (alterations in original)). Accordingly, petitioner's conviction became final and the one-year statute of limitations period began to run on March 19, 2008. Petitioner concedes that he therefore had "until March 19th, 2009 to file his 2254 [habeas] petition pursuant to AEDPA of 1996. Unless, as here, he can establish: a rare and exceptional circumstance, that would warrant . . . tolling." (Pet'r's Resp. at 8 (quotation marks and citation omitted).) Accordingly, the Court concludes that the one-year limitations period for filing petitioner's habeas petition expired on March 19, 2009, a little over four months before Rush filed his petition on July 23, 2009.

Despite petitioner's assertions to the contrary, the statute of limitations period should not be tolled in petitioner's case. As noted above, the Court recognizes that, pursuant to 28 U.S.C. § 2244(d)(2), the statute of limitations does not start to run during the time other post-conviction applications in state court are pending. *See*

28 U.S.C. § 2244(d)(2). In the instant case, however, petitioner made no collateral state court motions until July 14, 2009. Therefore, his one-year limitations period had already expired at that time and, thus, his state court motion did not alter the time the statute of limitations began to run. *See, e.g., Perez v. Bennett*, No. 99 Civ. 2475 (SAS), 1999 WL 553782, at *2 (S.D.N.Y. July 29, 1999) ("From April 24, 1996 until March 1998, however, petitioner did not take any action in the state or federal courts. Thus, by the time that petitioner filed his second Rule 440 motion in or around March 1998, he was already time barred . . . from filing any § 2254 petition."). The petition is untimely despite Rush's arguments that equitable and statutory tolling should be applied to his case so that his late petition may be deemed timely. Petitioner offers a variety of excuses for the fact that he did not submit his petition within the one-year statute of limitations period. Specifically, Rush claims that he is entitled to equitable relief because he was not allowed to take his New York court documents with him when he was transferred to New Jersey on an unrelated claim. (Pet'r's Resp. at 9.) Rush asserts that he used reasonable diligence to preserve his right to file a habeas petition by asking the Southern District of New York for an extension to file the petition in a letter dated October 15, 2008. (*Id*. at 15-16.) In the alternative, petitioner claims that he is entitled to statutory tolling under 28 U.S.C. § 2244(d)(1)(B), because the state created an unconstitutional impediment to his filing on time by not allowing him to take his legal documents with him when transferred to New Jersey. (*Id*. at 13-14.) The Court concludes that petitioner's case does not present extraordinary circumstances warranting either equitable tolling or statutory tolling under Section 2244(d)(1)(B).

1. Equitable Tolling

Although the instant petition is untimely, in "rare and exceptional" circumstances, the one-year statute of limitations is subject to equitable tolling. *See Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000); *see also Warren v. Garvin*, 219 F.3d 111, 113 (2d Cir. 2000). In order to obtain the benefit of equitable tolling, a petitioner must demonstrate that: (1) "extraordinary circumstances prevented him from filing his petition on time"; and (2) he "acted with reasonable diligence throughout the period he seeks to toll." *Smith*, 208 F.3d at 17. The petitioner bears the burden to affirmatively show that he is entitled to equitable tolling. *See Tho Dinh Tran v. Alphonse Hotel Corp.*, 281 F.3d 23, 37 (2d Cir. 2002), *superseded on other grounds*, *Slayton v. Amer. Exp. Co.*, 460 F.3d 215, 228 (2d Cir. 2006); *Hizbullahankhamon v. Walker*, 105 F. Supp. 2d 339, 344 (S.D.N.Y. 2000).

Petitioner argues that the period he was held in New Jersey on unrelated claims from July 28, 2008 to May 28, 2009, (Pet'r's Resp. at 11), should be tolled because he had limited access to his New York court documents during that time due to prison transfer policies. However, a petitioner's lack of access to legal materials or court documents does not warrant equitable tolling. *See Warren v. Kelly*, 207 F. Supp. 2d 6, 10 (E.D.N.Y. 2002) (holding that prison transfers or restricted access to the law library and inability to secure court documents do not qualify as extraordinary circumstances); *Hizbullahankhamon*, 105 F. Supp. 2d at 344 ("To meet the standards of extraordinary circumstances, petitioner must be able to prove that the cause of his delay was both beyond his control and unavoidable even with diligence," noting that inability to access law library was not

such extraordinary circumstance) (citing *Atkins v. Harris*, No. 98 Civ. 3188, 1999 WL 13719, at *2 (N.D. Cal. Jan. 7, 1999)). Nor does a prisoner's lack of legal knowledge or legal assistance entitle him to equitable tolling. *See, e.g., Romero v. Ercole*, No. 08-CV-4983 (RRM), 2009 WL 1181260, at *5 (E.D.N.Y. Apr. 30, 2009) (collecting cases); *Atkins*, 1999 WL 13719 at *2 ("Prisoners familiar with the routine restrictions of prison life must take such matters into account when calculating when to file" their habeas petition.). Petitioner argues that he was unaware of the statute of limitations period for filing his habeas petition and, with the advice of unnamed counsel, sent the October 15, 2008, letter to the Clerk of Court in the Southern District of New York requesting an extension to file his habeas petition for fear of missing a possible deadline. (Pet'r's Resp. at 15-16, n.2.) Yet petitioner told prison officials that he had a pending habeas deadline. (Pet'r's Resp. at 9; *see also* Section III.B.2) In any event, the lack of familiarity with the law or *pro se* status alone does not warrant equitable tolling. *See Smith*, 208 F.3d at 18 (holding that petitioner's *pro se* status does not establish sufficient ground for equitable tolling); *Ayala v. Miller*, No. 03 CV 3289(JG), 2004 WL 2126966, at *2 (E.D.N.Y. Sept. 24, 2004) ("Neither a [petitioner's] pro se status, nor his lack of expertise, provides a basis for equitable tolling of AEDPA's statute of limitations."); *Gillyard v. Herbert*, No. 01 Civ. 3427(DC)(GWG), 2003 WL 194692, at *3 (S.D.N.Y. Jan. 30, 2003) (stating that petitioner's *pro se* status, and concomitant ignorance of the law, does not equitably toll the statute of limitations period (listing cases)); *Francis v. Miller*, 198 F. Supp. 2d 232, 235 (E.D.N.Y. 2002) (stating that ignorance of the law and legal procedure is not an extraordinary circumstance warranting equitable tolling); *Wilson v.*

*Bennett*, 188 F. Supp. 2d 347, 354 (S.D.N.Y. 2002) ("[L]ack of legal knowledge cannot excuse a delay in filing a petition."); *see also Turner v. Johnson*, 177 F.3d 390, 392 (5th Cir. 1999) (holding that petitioner's unfamiliarity with the legal system or lack of representation does not warrant equitable tolling); *Barrow v. New Orleans Steamship Ass'n*, 932 F.2d 473, 478 (5th Cir. 1991); *James v. U.S. Postal Serv.*, 835 F.2d 1265, 1267 (8th Cir. 1988). Indeed, "[e]ven if [*pro se* petitioner] did not have all the necessary materials or experienced a delay in obtaining them, those are not extraordinary circumstances warranting equitable tolling. Moreover, even if the delays in receiving whatever documents he believed necessary could be considered extraordinary, [petitioner] has not shown that he made any effort to file his petition without them . . . ." *Padilla v. United States*, Nos. 02 Civ. 1142 (CSH), 94 CR. 313 (CSH), 2002 WL 31571733, at *4 (S.D.N.Y. Nov. 19, 2002); *see Davis v. McCoy*, No. 00 CIV. 1681 (NRB), 2000 WL 973752, at *2 (S.D.N.Y. July 14, 2000) (petitioner's lack of access to necessary court papers for two years did not constitute an extraordinary circumstance); *Fadayiro v. United States*, 30 F. Supp. 2d 772, 779 (D. N.J. 1998) (inability to obtain transcripts and other records needed for habeas petition did not rise to the level of "extraordinary circumstances" so as to justify equitable tolling).

Petitioner relies on *Lott v. Mueller*, 304 F.3d 918 (9th Cir. 2002), in an attempt to establish that he is entitled to equitable tolling because he was denied access to legal files. (Pet'r's Resp. at 13, 17.) However, in that case, the Ninth Circuit found that the "unusual facts" of that petitioner's circumstances, which included denial of access to his legal files due to multiple prison transfers, might have warranted

equitably tolling the statute of limitations. *Id*. at 924-25. In *Lott*, petitioner's application was filed only between seven and twenty days late. *Id*. at 921-24. The court further rested its holding on the fact that petitioner did not know that the filing deadline for his habeas petition was actually thirty days later than the date on which he thought it was due because of a forthcoming decision from the Ninth Circuit that affected the deadline. *Id*. at 922-23. Specifically, the court noted that "[e]ven with the benefit of legal training, ready access to legal materials and the aid of four years of additional case law, an informed calculation of [petitioner's] tolling period evaded both his appointed counsel and the expertise of a federal magistrate judge." *Id*. at 923. Accordingly, the *Lott* case is far from analogous to the instant matter.

The Court further notes that petitioner makes no claim that the prison's actions, by withholding his files, constituted an intentional attempt to impede petitioner's ability to timely file his petition. On the contrary, petitioner's papers indicate that the prison was merely following well-established procedures regarding prison transfers. (Pet'r's Resp. at 10-11.) Petitioner was even given the opportunity to confirm these policies with a supervisor who is "quite intimate with [all] D.O.C.S.' policies and procedures relating to property transfers and storage." (*Id*. at 10.) This supervising officer confirmed that an inmate is not permitted to travel with legal paperwork not related to the receiving jurisdiction. (*Id*.) As already stated above, in this Circuit, "[i]n general, the difficulties attendant on prison life, such as transfers between facilities, solitary confinement, lockdowns, restricted access to the law library, and an inability to secure court documents, do not by themselves qualify as extraordinary circumstances." *Gant v.*

*Goord*, 430 F. Supp. 2d 135, 139 (W.D.N.Y. 2006) (collecting cases).

Even assuming *arguendo* in this case that the prison transfer and inability to access legal materials constituted an extraordinary circumstance preventing petitioner from filing his petition on time, there must be a "causal relationship between the extraordinary circumstances on which the claim for equitable tolling rests and the lateness of his filing, a demonstration that cannot be made if the petitioner, acting with reasonable diligence, could have filed on time notwithstanding the extraordinary circumstances." *Valverde v. Stinson*, 224 F.3d 129, 134 (2d Cir. 2000). Petitioner argues he demonstrated reasonable diligence by writing to the Southern District of New York asking for an extension of time to file his habeas petition via letter dated October 15, 2008. Even assuming that petitioner sent this request, he cannot establish reasonable diligence because he waited approximately seven months to request an extension of time after leave to appeal was denied by the Court of Appeals. *See Smith*, 208 F.3d at 17-18 (reasoning that petitioner's 87-day delay in seeking collateral review was not reasonably diligent); *Hizbullahankhamon*, 105 F. Supp. 2d at 344 (S.D.N.Y. 2000) (holding the petitioner's 279-day delay in filing his first collateral attack is fatal to a claim of equitable tolling). Further, petitioner could have filed his habeas petition before he was sent to New Jersey. Petitioner had full access to all legal materials from December 20, 2007, the date on which leave to appeal was denied, until July 27, 2008, when he was transferred to New Jersey, and offers no explanation as to why he could not file his petition during those months. In addition, after sending a letter to the Southern District of New York, petitioner never followed-up to inquire about the status of his request;

without confirmation that the letter had been received and his request had been granted, petitioner had no reason to assume that the statute of limitations was stayed for this period of time. *Cf. Lewis v. Walsh*, No. 03 Civ. 1932 (DC), 2003 WL 21729840, at *3 (S.D.N.Y. July 25, 2003) ("Nor can petitioner show that he was reasonably diligent during the limitations period. Petitioner argues that he worked diligently to file his petition long before his time expired. Exhibits A-J of the petitioner's affirmation are letters from as far back as 1994 regarding petitioner's requests for documents to prepare a complete habeas corpus petition. These letters do not sufficiently demonstrate diligence to warrant equitable tolling." (citation omitted)).

In sum, petitioner's arguments regarding his *pro se* status and his lack of access to his legal materials do not warrant equitable tolling, nor has petitioner made a claim or showing of actual innocence. *See Whitley v. Senkowski*, 317 F.3d 223, 225 (2d Cir. 2003) (holding that it was an error to dismiss a petition claiming actual innocence, on statute of limitations grounds, without further analysis). Further, petitioner did not act with reasonable diligence when he failed to file his habeas petition while still in a New York prison and when he failed to assure that his request for an extension was granted. At a minimum, petitioner could have avoided this statute of limitations issue if he had diligently and timely filed his habeas petition even if he lacked his legal materials, and then supplemented his petition with additional material when he regained access to such documents. Accordingly, the Court concludes that there are no grounds for equitable tolling.

2. Statutory Tolling

As noted above, petitioner also argues that the statute of limitations should be tolled because the state created an unconstitutional impediment that prevented Rush from timely filing his habeas petition. Under 28 U.S.C. § 2244(d)(1)(B), AEDPA's statute of limitations period may be tolled during the time that a state-created unconstitutional impediment prevents the petitioner from filing a petition. *See Crawford v. Costello*, 27 F. App'x 57, 59 (2d Cir. 2001). In order to invoke Section 2244(d)(1)(B), a petitioner must show that "(1) he was prevented from filing a petition (2) by State action (3) in violation of the Constitution or federal law." *Egerton v. Cockrell*, 334 F.3d 433, 436 (5th Cir. 2003); *see also Bush v. Lantz*, No. 3:06-CV-410 (RNC), 2009 WL 522940, at *1 (D. Conn. Mar. 2, 2009). "Withholding a prisoner's legal papers and failing to provide him with access to library materials may provide a basis for relief under § 2244(d)(1)(B). But impediments of this nature do not 'prevent' a petitioner from filing on time when the petitioner makes no attempt to obtain legal papers and library materials despite having an ability to do so." *Bush*, 2009 WL 522940, at *1. Here, petitioner had approximately seven months between the date on which he was denied leave to appeal to the Court of Appeals and when he was transferred to the New Jersey facility. Petitioner did not file his habeas petition, nor request an extension of the statute of limitations, during that time. Thus, it cannot be said that petitioner's denial of access to his legal files once he was transferred to the New Jersey facility was a state-created impediment to him filing a timely petition. *See Scott v. Comm'r of Corr.*, No. 3:07-CV-1420 (CSH), 2008 WL 5172644, at *2 (D. Conn. Dec. 10, 2008) (court concluded that lack of access to legal

files was not a state-imposed impediment, noting that Scott's "prison's lack of federal materials in its law library and of assistance to prisoners filing state habeas petitions do not constitute state-imposed impediments under 28 U.S.C. § 2244(d)(1)(B)."); *Ramos v. Walker*, No. 99 Civ. 5088(LAK), 2002 WL 31251672, at *2 (S.D.N.Y. Oct. 8, 2002) (denying relief when petitioner made "no suggestion, for example, that he could not have redrafted any petition that may have been lost as a result of the action of prison authorities or that he could not have obtained copies of state court briefs, transcripts or other papers that might have been required for that purpose").

Petitioner's reliance on *Egerton v. Cockrell*, 334 F.3d 433 (5th Cir. 2003), is misplaced. (Pet'r's Resp. at 12.) In that case, the law library was inadequate because it did not contain a copy of AEDPA, so petitioner arguably had no knowledge of the statutory limitations period applicable to him. The state did not provide that information, and the court found that this constituted a state-created impediment pursuant to Section 2244(d)(1)(B). *Id.* at 438. However, despite petitioner's suggestion that he was unaware of the statute of limitations deadline, (Pet'r's Resp. at 15-16, n.2), there is contrary evidence suggesting he was aware of the AEDPA deadline; in fact, he wrote to the Southern District asking for an extension on October 15, 2008, five months prior to the expiration of the one-year limitations period. Also, when petitioner was informed on July 27, 2008 that he would be transferred, he told prison officials about his habeas deadline obligations. (Pet'r's Resp. at 9.) Assuming, *arguendo*, that petitioner was unaware of the statute of limitations period, he has not made any contention that the prison law library in New Jersey lacked the federal materials that he needed to learn about the applicable

statute of limitations. *Egerton* does not support Rush's argument.

\* \* \*

In sum, the Court concludes that Rush's petition is time-barred. Petitioner's conviction became final on March 19, 2008. He filed the instant motion on July 23, 2009, approximately four months after the one-year filing window ended. There is no basis for equitable tolling or statutory tolling. However, in an abundance of caution, the Court also has examined petitioner's arguments on the merits. As set forth below, even assuming *arguendo* that the petition is not time-barred, it should nevertheless be dismissed on the merits.

## C. Merits Analysis

### 1. Petitioner's Leg Restraints at Trial

The first ground for the instant habeas petition concerns the leg restraints that bound petitioner during his trial. Petitioner claims that his due process rights were violated because he remained shackled at trial, in presence of the jury. As set forth below, this claim is meritless and does not entitle petitioner to habeas relief.

The use of visible shackles or out-of-sight shackles of which the jury becomes "aware" during either the guilt phase or the penalty phase of a trial may constitute a violation of the defendant's right to due process. *See Deck v. Missouri*, 544 U.S. 622, 626, 633, 634 (2005), *abrogated on other grounds*, *Fry v. Pliler*, 551 U.S. 112 (2007). Specifically, it can compromise fundamental legal principles. First, visible shackling undermines the basic premise of our criminal justice system in which defendants are presumed innocent until proven guilty. *Id.* at 630. If a defendant is

shackled before a jury, it can suggest to the jury that "the justice system itself sees a need to separate a defendant from the community at large." *Id.* (quotation marks omitted). Second, the use of shackles can diminish a defendant's right to counsel by interfering with the defendant's "ability to communicate with his lawyer." *Id.* at 631 (quotation marks omitted). Similarly, shackles may interfere with a defendant's ability to participate in his own defense by preventing him from taking the witness stand. *Id.* Further, the use of shackles may constitute an "affront [to] the dignity and decorum of judicial proceedings." *Id.* (quotation marks omitted).

Nonetheless, shackling is unavoidable in circumstances where it may be necessary "to restrain dangerous defendants to prevent courtroom attacks." *Id.* at 632. Further, there is a recognized "need to give trial courts latitude in making individualized security determinations." *Id.* When a court justifiably orders that the defendant be shackled, the defendant suffers no prejudice if the court takes precautions to keep the restraints hidden from the jury. *See Mendoza v. Berghuis*, 544 F.3d 650, 651, 654-55 (6th Cir. 2008) (finding that a defendant who was deemed to be both a flight and security risk suffered no prejudice when the trial court skirted both counsel tables with brown paper to prevent the jury from seeing defendant's shackles); *United States v. Bin Laden*, No. S7R 98 CR1023KTD, 2005 WL 287404, at *3-4 (S.D.N.Y. Feb. 7, 2005) (holding the defendant was not prejudiced when the trial court took precautions to keep restraints hidden from the jury, including placing an apron around defense counsel's table to prevent the jury from seeing the shackles).

In determining if shackling is necessary, "the court cannot properly delegate [the

decision] to guards or other prison officials but must decide that question for itself. If there is a dispute as to the record on which the security questions are to be determined, the court should be willing to receive evidence. The court must impose no greater restraints than are necessary, and it must take steps to minimize the prejudice resulting from the presence of the restraints." *Hameed v. Mann*, 57 F.3d 217, 222 (2d Cir. 1995) (citing *Lemons v. Skidmore*, 985 F.2d 354, 356-59 (7th Cir. 1993)) (addressing shackling in a civil case brought by a prisoner); *see also Davidson v. Riley*, 44 F.3d 1118, 1125 (2d Cir. 1995) (lower court should have conducted an evidentiary hearing in civil case brought by prisoner where colloquy "strongly indicated the need for an evidentiary hearing as to whether Davidson was an escape risk[.]"); *Sides v. Cherry,* 609 F.3d 576, 582 (3d Cir. 2010) (in the context of a civil suit brought by a prisoner, analyzing criminal caselaw, court concluded that a trial judge must "hold a proceeding outside the presence of the jury to address [shackling] with counsel. However, where there are genuine and material factual disputes regarding the threat to courtroom security posed by a prisoner[], an evidentiary hearing is called for."). "In determining whether an unnecessary imposition of restraints was harmless, [a court must] weigh several factors, including the strength of the case in favor of the prevailing party and what effect the restraints might have had in light of the nature of the issues and the evidence involved in the trial." *Hameed*, 57 F.3d at 222; *see also Sides*, 609 F.3d at 582; *Lemons*, 985 F.2d at 359.

In the instant case, the court was informed at a pretrial hearing, held on February 25, 2002, of petitioner's threat that "the first chance he'd get, he'd run; and that

he'd kill a staff member with his own gun." (Hearing[4] at 6.) The trial judge stated:

It has come to my attention . . . that the jail was informed by Sergeant Disler who's the police liaison officer in District Court, and she made a statement which I understand is in the computer of the correctional facility[, Nassau County Correctional Center]. And this was given to my sergeant, Sergeant McDonough, through a Sergeant D'Amato who works for the correctional facility. And, the statement was something to the effect that Mr. Rush would run the first chance he gets and kill a staff member with his gun.

(*Id*. at 5-6.) Sergeant McDonough subsequently testified on the record that he spoke with both Sergeant D'Amato and Sergeant Disler, and described the statements made by Sergeant Disler to jail authorities about Rush, which ended up in the computer records at the correctional center. (*Id*. at 6.) The trial judge noted that "according to the correction people, . . . [Rush is] listed as [an] escape risk[]. And this is, as I understand through the correction officers and through the court officers, that when a defendant is an escape risk, they come up in leg shackles." (*Id*. at 8.) Although the court acknowledged that it was unable to determine the credibility of the statements in the computer record, the judge stated that he was compelled to take the threat seriously. (*Id*. at 6.) Petitioner's counsel consented to proceed with his client in shackles but "for the purposes of this hearing only." (*Id*. at 7.) At the trial, defense counsel pointed out that the testifying court officer did not have any first-hand knowledge about the events that

---
[4]  "Hearing" refers to the transcript of the February 25, 2002, hearing.

led to the computer entry in question and a printout of the computer record was never provided. (Tr. 14.) Defense counsel argued that a hearing on the shackling issue had to be held in light of the fact that Rush denied that he made any of the statements that were the subject of the computer record in question and in light of the fact that Rush was never actually "received a write-up or any disciplinary action as the result of any such entry being made in the Sheriff's Department computer." (Tr. 17; *see also id*. at 15.) The trial judge acknowledged that it was in his discretion to shackle Rush or not, (*id.* at 15-16), and noted that "we had some witnesses that actually went on the record at that point and explained to us exactly what the threat was." (Tr. 16.) To avoid any prejudice to petitioner, both counsel's tables were lined with brown paper table skirts so that there would be "no reason that any member of the jury would think that the defendant in any way is shackled." (Tr. 18.) Further, petitioner's hands were not restrained in any way, and when petitioner stood to give his opening statement, the counsel table was turned so that the jurors were unable to see that Rush's legs were shackled. (Tr. 13, 490, 512.)

Petitioner concedes that his shackles were not visible to the jury. (Pet'r's Merits Resp. at 3.) However, he argues that even where the shackles are not visible, a trial judge must "determin[e] facts necessary to justify application of restraints." (*Id*. at 4.) Rush asserts that the trial judge abused his discretion by "applying restraints [in his case] without a justifiable determination on the record." (*Id*. at 8; *see also id*. at 6.) Petitioner argues that he never made statements that were the basis for the trial judge's determination that he was a safety risk and the trial judge erroneously denied him the right to challenge the credibility of the statements against him by: (1) not

ordering the production of the computer record with the alleged statements made by Rush, and (2) by not allowing Rush to question witnesses with first-hand knowledge about how the statements allegedly made by Rush were entered into the computer system. (*Id.* at 7-8.) Rush argues that in failing to assess the credibility of statements made against him, after requests by defense counsel to hold a hearing, the trial judge inappropriately "deferred discretion to court staff," (*id.* at 11), especially in light of the fact that some officers involved in the pretrial hearing had "special interest" in getting attention that should have undermined their own credibility. (*Id.* at 19-20.) Finally, petitioner asserts that the trial judge inappropriately failed to provide a "curative instruction[]" to the jury to minimize the prejudice of shackling, (*id.* at 7), in light of the fact that the jury must have become aware of Rush's shackles because they made noise when he stood up to address the Court and because during voir dire, some members of the jury heard petitioner exclaim that his shackles were hurting him. (*Id.* at 25, 29-30.)

As a threshold matter, there is no evidence in the record to support that the trial court abused its discretion in ordering that shackles be used in this case. Moreover, as discussed above, the shackles were not visible to the jury and precautions were taken to avoid any prejudice to petitioner. In any event, even assuming *arguendo* that petitioner is right and the trial judge abused his discretion in determining that shackles were necessary and in failing to take all appropriate measures to limit prejudice to petitioner, any errors were harmless because the evidence of petitioner's guilt is overwhelming and thus any allegedly prejudicial effect of the shackles would have been outweighed by

the evidence of his guilt.[5] *See Hameed v. Mann*, 57 F.3d 217, 224 (2d Cir. 1995) (even where petitioner was erroneously shackled and the shackles were visible to the jury at times during the trial, any error by the trial judge was harmless); *Sides*, 609 F.3d at 584 ("We need not determine whether the District Court abused its discretion here, however, as we conclude that any error was harmless.") Petitioner was observed in the stolen vehicle minutes after the crime, just before he and Eason led the police on a chase through three counties, the Vallelys identified the ski masks that were found in the stolen vehicle as the masks that had been worn by the two intruders, and Mr. Vallely's stolen cell phone was also found inside the vehicle. Further, Mrs. Vallely identified the gun found near the crash site of the vehicle driven by petitioner and Eason as the weapon brandished by the intruders. Additionally, on September 30, 2002, in the Supreme Court, Bronx County, in connection with his guilty plea to first-degree reckless endangerment, petitioner admitted, under oath, that he and Eason had stolen the vehicle that he was in at approximately 2:30 p.m. on November 24, 2000. *Cf. Cotto v. Mann*, 991 F. Supp. 124, 131, 133, 136 (E.D.N.Y., 1998) (granting habeas relief to petitioner whose conviction relied heavily on out-of-court statements that were exceedingly prejudicial and where the remaining evidence against the petitioner was likely insufficient to convict).

---

[5] Similarly, to the extent petitioner argues that his shackles impeded him from representing himself because he was not free to move around the courtroom like the prosecutor, (Pet'r's Merits Resp. at 32), that argument is also without merit because any error committed by the trial judge in preventing petitioner from moving around the courtroom was harmless.

In short, the trial court's decision to allow petitioner to be placed in leg irons during the trial, and the Appellate Division's affirmance of that decision, were neither contrary to nor an unreasonable application of clearly established federal law. Similarly, it was not an unreasonable determination of the facts in light of the state court record. Accordingly, the claim for habeas relief based on the use of leg restraints at trial is denied.

## 2. Admission of Testimony Regarding Out of Court Statements That Implicated Petitioner

Petitioner argues that the state court erroneously admitted the testimony of a detective alluding to an out-of-court statement made by Eason that he "shouldn't have thrown the gun out the window." (Tr. 797.) The government asserts that this claim is procedurally barred or, in the alternative, is without merit. As set below, the Court agrees.

### a. Procedural Bar

A petitioner's federal claims may be procedurally barred from habeas corpus review if they were decided at the state level on "adequate and independent" state procedural grounds. *Coleman*, 501 U.S. at 749-50. The procedural rule at issue is adequate if it is "firmly established and regularly followed by the state in question." *Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999) (quotation marks omitted). The "state court must actually have relied on the procedural bar as an independent basis for its disposition of the case," *Harris v. Reed*, 489 U.S. 255, 261-62 (1989), by "clearly and expressly stat[ing] that its judgment rests on a state procedural bar." *Id.* at 263 (internal quotation marks omitted). If it determines that a claim is procedurally

barred, a federal habeas court may not review the claim on the merits unless the petitioner can "demonstrate both cause for default and prejudice resulting therefrom, or if he can demonstrate that the failure to consider the claim[] will result in a miscarriage of justice." *Coleman*, 501 U.S. at 750. A miscarriage of justice is demonstrated in extraordinary cases, such as where a constitutional violation results in the conviction of an individual who is actually innocent. *Murray v. Carrier*, 477 U.S. 478, 496 (1986), *superseded by statute on other grounds* AEDPA, Pub. L. 104-132, 110 Stat. 1214.

Here, petitioner's second claim is procedurally defaulted. In reviewing on direct appeal the petitioner's argument that his confrontation rights were violated because the state court erroneously admitted testimony about Eason's out-of-court statement, the Appellate Division stated that the claim was "not preserved for appellate review" because petitioner failed to raise the claim at trial. *See Rush*, 843 N.Y.S.2d at 393. Under New York Law, a claim is preserved for appellate review if the litigant raised the same claim before the trial court. *See* N.Y. Crim. Proc. Law § 470.05(2) (McKinney 2009); *People v. Medina*, 53 N.Y.2d 951, 952 (N.Y. 1981). Furthermore, New York's preservation doctrine is firmly established and regularly followed. *See Garvey v. Duncan*, 485 F.3d 709, 715-16 (2d Cir. 2007). Failure to preserve an issue for state appellate review is an adequate and independent state procedural ground that will preclude federal habeas review of the issue. *Glen v. Bartlett*, 98 F.3d 721, 724-25 (2d Cir. 1996) (finding that failure to preserve issue for appeal was adequate and independent state law ground precluding federal habeas review and further noting that "federal habeas review is foreclosed when a state court has expressly relied on a

procedural default as an independent and adequate ground, even where the state court has also ruled in the alternative on the merits of the federal claim"); *see also Fernandez v. Leonardo*, 931 F.2d 214, 216 (2d Cir. 1991). Petitioner's argument is therefore not preserved for this Court's review because the Appellate Division dismissed his argument on procedural grounds, even though it addressed the merits of Rush's claim in the alternative.

Moreover, petitioner has demonstrated neither "cause and prejudice" for his procedural default nor that failure to consider the claim will result in a miscarriage of justice, i.e., that he is actually innocent of the crimes for which he was convicted. *See Coleman*, 501 U.S. at 748-51 (1991); *Murray*, 477 U.S. at 496. Accordingly, petitioner's argument that testimony regarding Eason's out-of-court statement should not have been admitted is procedurally defaulted.

b. Merits Analysis

Even if the claim here was not procedurally defaulted by plaintiff, and the state court erred in allowing the detectives to refer to Eason's out-of-court-statement, any error was harmless for purposes of habeas review. *See Fry*, 551 U.S. at 121 (holding that "in § 2254 proceedings a [federal] court must assess the prejudicial impact of constitutional error in a state-court criminal trial" by determining whether the error had a "'substantial and injurious effect'" on the jury's verdict (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993))); *see also United States v. McClain*, 377 F.3d 219, 222 (2d Cir. 2004) ("It is well established that violations of the Confrontation Clause, if preserved for appellate review, are subject to harmless error review, . . . and *Crawford* [*v.*

*Washington*, 541 U.S. 36 (2004)] does not suggest otherwise."). The reference to the presumably incriminating out-of-court statement was a small part of the prosecution's overall case. (Tr. 797-98, 927-28.) *Cf. Ellison v. Sachs*, 769 F.2d 955, 956 (4th Cir. 1985) (holding that habeas relief was properly granted when the prosecution relied very heavily on out-of-court statements which were not at all reliable, violating the Confrontation Clause). As noted earlier, the evidence of petitioner's guilt was overwhelming. Petitioner was observed in the stolen vehicle minutes after the crime, just before he and Eason led the police on a chase through three counties, the Vallelys identified the ski masks that were found in the stolen vehicle as the masks that had been worn by the two intruders, and Mr. Vallely's stolen cell phone was also found inside the vehicle. Further, Mrs. Vallely identified the gun found near the crash site of the vehicle driven by petitioner and Eason as the weapon brandished by the intruders. Additionally, on September 30, 2002, in the Supreme Court, Bronx County, in connection with his guilty plea to first-degree reckless endangerment, petitioner admitted, under oath, that he and Eason had stolen the vehicle that he was in at approximately 2:30 p.m. on November 24, 2000. *Cf. Cotto v. Mann*, 991 F. Supp. 124, 131, 133, 136 (E.D.N.Y., 1998) (granting habeas relief to petitioner whose conviction relied heavily on out-of-court statements that were exceedingly prejudicial and where the remaining evidence against the petitioner was likely insufficient to convict). In short, although this issue is procedurally defaulted, were this Court to reach the merits and find that the trial court committed error, any error would be harmless given the overwhelming evidence of petitioner's guilt. Accordingly, this claim does not provide a ground for habeas relief. The Appellate Division's determination was not contrary to, nor an

unreasonable application of, clearly established federal law, and was not an unreasonable determination of the facts in light of the evidence presented in state court.

### 3. Denial of Right to Proceed *Pro Se*

Petitioner also contends that he was denied his right to self-representation. As set forth below, a review of the state court record demonstrates that petitioner did not make an unequivocal and clear request to represent himself. Accordingly, the state court's initial rejection of this claim was not erroneous and does not provide a ground for habeas relief.

In *Faretta v. California*, the Supreme Court held that the Sixth Amendment of the United States Constitution grants a criminal defendant the right to represent himself at trial *pro se*. 422 U.S. 806, 819 (1975). "[T]he Supreme Court declared that this right may be exercised by all criminal defendants who knowingly, voluntarily, and unequivocally waive their right to appointed counsel." *Johnstone v. Kelly*, 808 F.2d 214, 216 (2d Cir. 1986) (citing *Faretta*, 422 U.S. at 835-36). In order for a defendant to waive the right to counsel, there must be an initial request to proceed *pro se* that is clear and unequivocal. *See Williams v. Bartlett*, 44 F.3d 95, 100 (2d Cir. 1994). Even if the defendant asserts this right to self-representation, the right may be subsequently waived if the defendant either abandons the request altogether or vacillates on the issue. *Id.* If courts allowed equivocal requests, convicted criminals could easily disrupt unfavorable verdicts rendered in trials where they were represented by counsel. *See United States ex rel. Maldonado v. Denno*, 348 F.2d 12, 16 (2d Cir. 1965).

In addition to the defendant knowingly and unequivocally raising the request to proceed *pro se*, the right of a defendant to represent himself at trial must be timely asserted. The Second Circuit has held that the right to proceed *pro se* is unqualified "only if exercised before the commencement of trial." *United States v. Matsushita*, 794 F.2d 46, 51 (2d Cir. 1986) (quoting *Sapienza v. Vincent*, 534 F.2d 1007, 1010 (2d Cir. 1076)); *see also United States v. Brown*, 744 F.2d 905, 908 (2d Cir. 1984). In *Maldonado*, the Second Circuit held that the unqualified right of defendants to have their requests to represent themselves granted exists until a jury is chosen and the case is ready for trial. 348 F.2d at 15-16. The court requires that defendants make timely requests to proceed *pro se* to "ensure the orderly administration of justice and prevent the disruption of both the pre-trial proceedings and a criminal trial." *Williams*, 44 F.3d at 99 (citing *Sapienza*, 534 F.2d at 1010). Thus, after a defendant begins a trial where he is represented by counsel, the Sixth Amendment right to proceed *pro se* is "sharply curtailed." *Maldonado*, 348 F.2d at 15. Once the right to self representation becomes qualified, "[t]here must be a showing that the prejudice to the legitimate interests of the defendant overbalances the potential disruption of proceedings already in progress, with considerable weight being given to the trial judge's assessment of this balance." *Id.* The "reason for the request, the quality of the counsel representing the party, and the party's prior proclivity to substitute counsel are all appropriate criteria to be factored into the balance." *Sapienza*, 534 F.2d at 1010.

As discussed in detail below, the Court concludes that the record supports the state court's finding that petitioner was equivocal in his desire to proceed *pro se*. At no time prior to January 13, 2003, the fifth day of

jury selection, when the judge granted petitioner's request to proceed *pro se*, did petitioner state his request in a clear and unequivocal manner as required under well-established Supreme Court and Second Circuit precedent. Thus, as discussed below, Rush's claim that he was denied his right to self-representation does not provide a ground for habeas relief.

On January 7, 2003, at the start of jury selection, petitioner informed the court that he wanted new counsel because his assigned counsel had not filed all of the motions that petitioner wanted him to file and had not visited him as often as petitioner would have liked. (Tr. 2-8.) Petitioner did not at that time state a desire to proceed *pro se*, but instead asked for new counsel to be appointed. (Tr. 8.) When told by the judge that he did not possess the right to have the court assign the counsel of his choice, petitioner asked for time "to get another attorney," which the court denied. (Tr. 8.)

Three days later, on January 10, 2003, which was the fourth day of jury selection, petitioner advised the court, through his assigned counsel, that his family had spoken with and retained another attorney, who would appear the following Monday. (Tr. 298.) Petitioner, by way of his assigned counsel, then asked for a recess until that Monday so that his newly retained counsel would have an opportunity to participate in the voir dire. (Tr. 298.) Because neither the court nor petitioner's assigned counsel had any information regarding retained counsel who would appear that Monday to represent the petitioner, the court denied the request for a recess. (Tr. 300-01.) Petitioner then declared, "I will go pro se until then. . . . I will go pro se, if I have to right now." (Tr. 302.) Following a break in the proceedings, the court denied petitioner's request to proceed *pro se*, characterizing the request as

untimely and not unequivocal. (Tr. 303.) Accordingly, petitioner's assigned counsel conducted the jury selection for the remainder of the day.

On the following Monday, January 13, 2003, no new counsel appeared to represent petitioner. The court informed counsel that the allegedly newly retained attorney had spoken with chambers and informed the judge that he would not, in fact, be representing the petitioner. (Tr. 401-02.) Assigned counsel reiterated petitioner's desire to proceed *pro se*, and that after having spoken with petitioner that morning, counsel believed petitioner's request was unequivocal. (Tr. 402-04.) The court then declared that "up until his point the Court finds there has been no unequivocal waiver on [petitioner's] part to go pro se. Rather, it was [petitioner's] indication to the Court that he was going to be retaining new counsel. . . . [petitioner told the court that] he wanted to go pro se until new counsel arrived. Since this was not an unequivocal request to go pro se, the Court denied it at that point." (Tr. 404-05.) The court then questioned petitioner about his desire to proceed *pro se*:

> [COURT]: However, I just want the record to be clear that I'm going to, at this point, question you with respect to your ability to go pro se, Mr. Rush. . . . First of all, will there be any other attorneys that you will be desiring to retain at this point?
>
> [DEFENDANT:] I need an advisor.
>
> [COURT:] No. I'm talking about an attorney to represent you at this point.

[DEFENDANT:] My family has the money to retain somebody.

[COURT:] See, so you're telling me you're going to retain an attorney. Then you're now telling me that you unequivocally want to go pro se. I want to know at this point – yes, Mr. Rush?

[DEFENDANT:] I'm telling you, I'm going pro se.

[COURT:] So, you will not be retaining any attorney, is that what you're indicating to me?

[DEFENDANT:] As of this point, no.

[COURT:] You mean, at some future point, you may want an attorney?

[DEFENDANT:] A legal advisor, yes.

[COURT:] Well, a legal advisor is another story.

(Tr. 405-07). The court then conducted an extensive inquiry into petitioner's knowledge and experience, and provided comprehensive warnings about the wisdom of proceeding *pro se*, and gave petitioner the opportunity to confer with his assigned counsel. (Tr. 407-34.) After repeated assurances from petitioner that he understood the risks yet still wanted to represent himself, the court granted his request. (Tr. 434.) Petitioner's request to proceed *pro se* was granted on Monday, January 13, 2003.

As noted above, under *Maldonado*, petitioner had an unqualified right to represent himself if he made a knowing and unequivocal request to exercise that right in the pre-trial phase. *Maldonado*, 348 F.2d at 15-16. However, Rush's initial statements in court did not show a "purposeful choice reflecting an unequivocal intent to forego the assistance of counsel." *Williams*, 44 F.3d at 100 (quoting *United States v. Tompkins*, 623 F.2d 824, 827-28 (2d Cir. 1980)). Before ever making reference to representing himself, petitioner first tried to have his counsel reassigned. The Court recognizes that "[a] request to proceed *pro se* is not equivocal merely because it is an alternative position, advanced as a fall-back to a primary request for different counsel." *Johnstone*, 808 F.2d at 216 n.2. However, context is important in determining whether a defendant clearly invokes his right to self-representation. Here, petitioner did not clearly seek self-representation as a fall-back position. Instead, his reference to proceed *pro se* was contained in the same statement as his request for a recess to await his new attorney. In that context, it was certainly reasonable for the state court to view the passing reference to self-representation as simply a figurative expression of frustration or hyperbole by petitioner rather than as an unequivocal attempt to invoke his right to represent himself as an alternative position. This is especially true considering the fact that petitioner qualified his request to proceed *pro se* by saying that he would go *pro se* *until* the new attorney appeared the following Monday. (Tr. 302.) *See, e.g.*, *Burton v. Collins*, 937 F.2d 131, 134 (5th Cir. 1991) ("The fact that there is more than one reasonable interpretation of the dialog between Burton and the trial judge is, in a sense, the best evidence that Burton did not clearly and unequivocally assert his right to self-representation."); *see also United States*

*v. Ibarra*, 236 Fed. App'x 10, 14 (5th Cir. 2007) ("[S]tatements delivered contemporaneously with the purported self-representation requests similarly create a reasonable interpretation of the requests other than an interpretation that Ibarra sought to waive his fundamental constitutional right to counsel."). This Court's conclusion on this issue is consistent with numerous other courts that have found that similar passing references to proceed *pro se*, made in the context of a denial of a motion to replace counsel, were equivocal. *See, e.g.*, *Reese v. Nix*, 942 F.2d 1276, 1281 (8th Cir. 1991) (finding that a request to proceed *pro se* was not clear and unequivocal where the defendant stated, "Well, I don't want no counsel then," after the trial court denied his motion to substitute counsel and finding that such statement "seem[ed] to be an impulsive response to the trial court's denial of his request for new counsel"); *Burton v. Collins*, 937 F.2d 131, 132-34 (5th Cir. 1991) (finding a request for self-representation was equivocal where defendant's question, "May I represent myself?" was asked after the judge informed the defendant that his current counsel would not be replaced); *see also United States v. Pena*, 279 Fed. App'x 702, 707 (10th Cir. May 27, 2008) ("The sole evidence of such an intention [to represent himself] is the one question ('[c]an I represent myself?') that Mr. Pena asked in the middle of a colloquy with the judge that primarily concerned his dissatisfaction with his current counsel Mr. Rozan and his request for a new attorney . . . . When the judge did not answer his question about self-representation, Mr. Pena did not pursue the issue in any way: neither in the trial proceedings nor in a written motion did he ever mention self-representation again. Moreover, in his statements to the judge after his question about representing himself, Mr. Pena continued to express his dissatisfaction with Mr. Rozan and his request for a different lawyer. . . . Here, Mr. Pena did not make such an unequivocal and timely request." (citations omitted)); *United States v. Light*, 406 F.3d 995, 999 (8th Cir. 2005) (finding that a request to self-representation was equivocal where the defendant asked, "What's the rule on representing yourself?" after the defendant was warned about misbehaving in the courtroom); *United States v. Manthey*, 92 Fed. App'x 291, 295 (6th Cir. 2004) ("We do not assess this single, off-the-cuff remark [that he wanted to defend himself] as the clear and unequivocal request to proceed *pro se* required by *Faretta v. California.*" (citation omitted)); *Green v. Prosper*, No. CV 05-8759-JVS (PLA), 2007 WL 4969523, at *5 (C.D.Cal. Dec. 17, 2007) ("the record reflects that petitioner's request to represent himself was not unequivocal because petitioner had previously requested that the trial court appoint new counsel and he was unclear in his request immediately prior to trial whether he was requesting new counsel or requesting to represent himself."). Thus, the record supports the state court's finding that petitioner's initial reference that he would proceed *pro se* was equivocal.

Petitioner cites *Williams* in support of his argument. (Pet'r's Merits Resp. at 40-41.) His reliance on that case is misplaced. In *Williams,* the Second Circuit concluded that the petitioner was unconstitutionally denied his right to self-representation because he clearly and unequivocally informed the trial judge of his desire to proceed *pro se:*

> The record is clear that on more than one occasion Williams clearly and unambiguously asserted his desire to represent himself at his criminal trial. He elected to forgo counsel before the grand jury. At his

arraignment, Williams stated, "I will represent myself." Later, Williams asked that his case be placed on Justice Doyle's docket so he could renew his application to act pro se. As represented by Williams's counsel at the time, the sole purpose of the September 18, 1990 hearing was to address Williams's application to discharge his appointed counsel and proceed *pro se*. At the hearing, Williams declared: "it's . . . my intention[ ] now to go pro se. Before I wanted to have an attorney, but I can't afford a private attorney. That's why I'm going pro se."

44 F.3d at 100. Given that record in the state court, the Second Circuit found that, "[o]n each of these occasions, Williams's statements show a 'purposeful choice reflecting an unequivocal intent to forego the assistance of counsel.'" *Id.* (quoting *Tompkins*, 623 F.2d at 827-28).

Although petitioner does not specifically rely on *Maldonado*, that case is also instructive here. The situation in *Maldonado* also was far different from the factual record here. Specifically, in *Maldonado,* the petitioner made separate, unequivocal requests to represent himself *after* the Court denied his request of assignment of other counsel:

When the cases were called on the calendar but before the jury had been chosen, both Maldonado and DiBlasi asked for the assignment of other counsel. The trial judge denied their requests. Maldonado then stated, 'Your Honor, if I feel that the case must go on, I want to be able to act as my own attorney. Would you give me

that permission, sir?' This request likewise was denied.

348 F.2d at 14. Thus, in *Maldonado*, there was a clear request and a clear denial by the state court of petitioner's right to self-representation.

In the instant case—unlike in *Williams* and *Maldonado*—petitioner made a passing, off-the-cuff reference to self-representation while requesting new counsel and never made any other indication that he would represent himself prior to the commencement of jury selection, even after his request for appointment of new counsel was denied. This Court therefore finds that petitioner's initial request to proceed *pro se* was equivocal, and the trial court did not err in denying the initial request to proceed *pro se*.

In short, although a request for self-representation is not equivocal simply because it is an alternative position to a request for new counsel or because it was only mentioned in one appearance, the actual request must nevertheless be clear and unequivocal. Here, petitioner's statements on January 7 and January 10, 2003, were a far cry from a clear and unequivocal request to proceed *pro se*. A review of the record demonstrates that a reasonable interpretation is that Rush's initial references to self-representation were made as a result of his frustration with the denial of his motion for new counsel and did not constitute a sincere request to proceed *pro se*. *See Collins*, 937 F.2d at 134. Thus, the state court's decision was neither contrary to, nor an unreasonable application of, clearly established federal law, and was not based on unreasonable determination of the facts in light of the evidence presented in the state court proceeding. There is no basis to disturb the

state court's finding on this issue in the context of a habeas petition.

\* \* \*

In sum, the Court concludes that Rush's habeas petition is untimely and there is no basis for equitable or statutory tolling of the statute of limitations period. In the alternative, all of Rush's arguments are dismissed on the merits.

## IV. CONCLUSION

For the foregoing reasons, petitioner has demonstrated no basis for relief under 28 U.S.C. § 2254. Rush's habeas petition is time-barred and the statute of limitations should not be tolled in this case. In the alternative, the petition is dismissed on the merits because petitioner has failed to point to any state court ruling that was contrary to, or an unreasonable application of, clearly established federal law, or that resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. Moreover, petitioner has failed to demonstrate that an evidentiary hearing is warranted on any of the issues that he has raised because he has failed to indicate any factual issues that need resolution through a hearing.

Accordingly, the instant habeas petition is denied in its entirety as untimely, and in the alternative, on the merits. Because petitioner has failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability shall issue. *See* 28 U.S.C. § 2253(c)(2). The Clerk of the Court shall enter judgment accordingly and close the case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated:    February 2, 2011
          Central Islip, New York


Petitioner appears *pro se*. Attorneys for respondent are Tammy J. Smiley and Jason P. Weinstein, Assistant District Attorneys, on behalf of Kathleen M. Rice, District Attorney, Nassau County, 262 Old Country Road, Mineola, NY 11501.